FILED
2026 Apr-30  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TAMEKA FITZPATRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:23-cv-1658-EGL |
| | ) | |
| CITY OF BIRMINGHAM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

On December 7, 2023, Tameka Fitzpatrick sued the City of Birmingham. *See* Doc. 1. On June 10, 2024, Fitzpatrick filed an amended complaint against the City. *See* Doc. 20. The City now moves for summary judgment. Doc. 36. For the reasons below, the motion is **GRANTED**.

## BACKGROUND

Fitzpatrick began working as an Administrative Analyst in the City of Birmingham's Planning, Engineering, and Permits ("PEP") department in May 2021. Doc. 37 at ¶2. On May 24, 2021, she signed an acknowledgement of the City's Attendance and Tardiness, ADA, and FMLA policies. *Id.* at ¶48. Katrina Thomas, Director of PEP, served as the final decisionmaker for Fitzpatrick's discipline; Jason Hjetland served as Fitzpatrick's immediate supervisor. *Id.* at ¶¶3-4. Her assigned schedule was Monday through Friday, 8:00 AM to 5:00 PM. *Id.* at ¶5.

City policy defines an "AWOL" absence as any instance in which an employee arrives more than thirty minutes late or fails to call in or report to her assigned location. *Id.* at ¶¶6-7. Four AWOLs within a twelve-month period result in termination. *Id.* at ¶8. Fitzpatrick accumulated four such absences during her employment. *Id.* at ¶7.

In July 2022, Fitzpatrick informed Hjetland that she was experiencing serious medical complications. Doc. 41 at 3. She received FMLA guidance during the first week of August 2022. Doc. 37 at ¶49. On October 20, 2022, Hjetland and Thomas heard what they believed to be Fitzpatrick snoring in her office; Fitzpatrick initially admitted to dozing off, but later attributed the sound to noisy breathing caused by COVID. *Id.* at ¶¶31-32; Doc. 41 at 14-15. Around that same time, Hjetland was directed to provide Fitzpatrick with FMLA information. Doc. 41 at 4; Doc. 37 at ¶49.

Fitzpatrick was separately assigned to create a departmental newsletter. Doc. 37 at ¶33. In her draft newsletter, Fitzpatrick included a statement from Mayor Randall Woodfin, which she obtained from the Mayor without approval from her supervisor. *Id.* at ¶¶33-34. On October 27, 2022, after being asked to produce the email from which she obtained the statement, Fitzpatrick provided a lengthy response that included the following comments:

> My communications outside of City Hall are personal and confidential. It is not my standard or practice to tell other people's business whether great or small, and I have a right to exercise my 1st Amendment right of Freedom of Speech. Such a question is far reaching and makes me

wonder many things such as, "What else? Will I be asked for the dates of my menstrual cycle since I've had absences dealing with hemorrhaging? My blood type? Who I've dated? How many times I've gone to the restroom in a day? Who are all of my friends, cousins, acquaintances? What constituents I spoke to passing in the grocery store? Are there no limits? What is the reason for this question? Has someone been harmed by me trying to produce content and motivation for this newsletter I was assigned? Am I being retaliated against for having a complaint about hostility I received from Kim? What is this?" Those were my thoughts.

*Id.* at ¶¶35-36. Not done, Fitzpatrick continued:

I am very surprised and disappointed at this reaction as I called myself utilizing my resources, being creative and thinking outside of the box to do a good deed in surprising this department with a gift intended to motivate and inspire. As mentioned before, in doing my work of researching and assessing pulse (morale) and performance of our department for over 18 months, many people have complained about a toxic level of micromanagement, dichotomy, and being hindered from applying their highest potential in knowledge, skills, and abilities. Many people from different divisions have told me, "The only way to survive or get ahead in PEP is to be the best slave you can be and mindlessly say, 'Yessum master'." Others have said, "Don't have or use the mind or skills God gave you. Be a puppet if you want to be a leader." ... "The daily goal is to clock in and clock out; doing more than that will place a target on your back." ---- I have written notes of all kinds of comments that represent low morale along with other negative outcomes, and even though according to them feel like step-children; I did not believe them ... or didn't want to believe them making justifications in my mind to counter their feelings and faulting them for not speaking up.

Along with other personal experiences and seeing this response to me trying to do my work in the spirit of excellence, to go beyond the status quo, and give a priceless gift has convinced me to believe them. Now I must get back to work as this is taking away from my focus and attention in producing other deliverables. Thank you.

Doc. 35-2 at 71.

Fitzpatrick's email was not well received. Later that day, Fitzpatrick was placed on paid administrative leave. Doc. 37 at ¶¶37-38. On November 2, she received a Notice of Pre-Determination addressing her pending disciplinary charges. *Id.* at ¶39.

On November 10, HR emailed Fitzpatrick FMLA forms with a fifteen-day deadline to submit them. *Id.* at ¶50. A Notice of Eligibility followed on November 15. *Id.* at ¶51. On November 17, 2022, Fitzpatrick submitted an FMLA request for intermittent leave from November 3, 2022, through January 4, 2023. *Id.* at ¶52. Her Pre-Determination Hearing was held the same day, during which she presented a fabricated email purporting to be from former PEP Director Edwin Revell. *Id.* at ¶42. On November 22, she submitted a Request for Leave of Absence for unpaid FMLA leave covering December 12, 2022, through January 4, 2023, with supporting documentation submitted the following day. *Id.* at ¶¶53-54.

Before any decision issued on her leave request, Thomas terminated Fitzpatrick's employment effective November 29, 2022. *Id.* at ¶¶43, 55. Thomas cited unprofessional communications, failure to complete assignments, insubordination, fraud, excessive absences, and sleeping at work, and testified that she would have made the same decision regardless of Fitzpatrick's medical condition or FMLA requests. *Id.* at ¶¶44-47.

Fitzpatrick then sued the City of Birmingham asserting four claims: (1) FMLA interference; (2) FMLA retaliation; (3) ADA discrimination; and (4) ADAAA retaliation. Doc. 20 at ¶¶19-54.

## STANDARD

Summary judgment is appropriate when the facts, supported by the record and taken in the light most favorable to the nonmovant, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And one is "material" if it is an element of the underlying claim that might affect the case's outcome. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The movant bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The movant may discharge its burden by pointing out to the district court that there is no evidence supporting an essential element of the nonmovant's case. *Id.* at 325. The district court must view the evidence and all factual inferences in the light most favorable to the nonmovant. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmovant then must show that summary judgment is improper by coming forward with specific

facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the record evidence would not permit a rational trier of fact to find for the nonmovant, then there is no genuine dispute for trial. *Id.* All reasonable doubts, however, are resolved in favor of the nonmovant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## DISCUSSION

### I.    Count 1: FMLA Interference

Fitzpatrick claims that the City interfered with her FMLA rights in three ways: by ignoring her statements about her health and failing to inform her about FMLA leave, Doc. 20 at ¶24; by "conspir[ing] to terminate" her after she repeatedly requested permission to work from home due to her medical condition, *id.* at ¶25; and by continuing disciplinary proceedings against her and "aggressively" scheduling her Pre-Determination Hearing while aware of her serious health conditions, *id.* at ¶¶26-27.

The City responds that Fitzpatrick has failed to identify what notice it was required to provide, or what triggered that obligation. Doc. 37 at 15. It further contends that the record establishes Fitzpatrick received FMLA guidance several times: she signed an acknowledgement of the City's FMLA policy on May 24, 2021; a notice poster was displayed in her work area; the policy was available on the City's intranet and upon request from any supervisor or HR representative; the City's

6

annual Employee Benefit Guide summarized employees' FMLA rights; Hjetland personally provided her FMLA guidance in the first week of August 2022 and again around October 20, 2022; and HR issued her a Notice of Eligibility on November 15, 2022. *Id* at ¶¶48-49, 51, 64.

The FMLA prohibits employers from interfering with, restraining, or denying the exercise of any right the statute confers. *Rudy v. Walter Coke, Inc.*, 21 F. Supp. 3d 1228, 1237 (N.D. Ala. 2014), *aff'd*, 613 F. App'x 828 (11th Cir. 2015). To prevail on an interference claim, a plaintiff must show that (1) she was entitled to a benefit under the FMLA; (2) her employer denied her that benefit; and (3) the denial caused her harm or prejudice. *Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1121 (11th Cir. 2023). The FMLA is not a strict liability statute, and an employer avoids liability for interference if it can show that its adverse employment decision was unrelated to the employee's use of, or request for, FMLA leave. *Rudy*, 21 F. Supp. 3d at 1238.

Fitzpatrick's claim is best understood as one for failure to provide notice of statutory rights. The FMLA's implementing regulations identify several categories of notice an employer must provide at different junctures. *See* 29 C.F.R. § 825.300. Though Fitzpatrick does not specify which notice she was denied, her allegations point to eligibility notice under § 825.300(b) and rights-and-responsibilities notice under § 825.300(c). The former notice "must state whether the employee is eligible for FMLA leave," *id.* § 825.300(b)(2), while the latter must "detail[] the specific ...

obligations of the employee and explain[] any consequences of a failure to meet these obligations," *id.* § 825.300(c)(1).

An employer's obligation to provide both categories of notice is triggered when either the employee requests leave or the employer acquires knowledge that the employee's leave may be FMLA-qualifying. *Graves*, 67 F.4th at 1121. That bar is low, but still requires, "at the very least, that an employee actually seek leave" before the employer's obligation is triggered. *Id.* at 1121-22.

The undisputed facts establish that the City was aware of Fitzpatrick's medical problems by July 2022 and provided her individual FMLA guidance by October of that year. Doc. 41 at 2; Doc. 37 at ¶49. Assuming that sequence gives rise to a prima facie notice claim, the claim nonetheless fails at the third element: Fitzpatrick has not shown that the delayed notice caused her any harm or prejudice. The record indicates that she was permitted leave, without exception, each time she cited a medical reason for her absence. Doc. 37 at ¶19. Fitzpatrick does not address this deficiency in her summary judgment briefing, and allegations that would contest it appear absent from her complaint. *See generally* Docs. 20, 41. "Because the employee received all the leave she requested, … she ha[s] not demonstrated that she suffered any damages as a result of [the City]'s actions," and she thus cannot "recover under the FMLA." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1275 (11th Cir. 2020) (internal quotation marks omitted). Fitzpatrick has failed to show that any

8

delay in notice deprived her of a benefit she would otherwise have received; therefore, summary judgment is warranted on Count 1 in the City's favor.

## II.    Count 2: FMLA Retaliation

Fitzpatrick claims her termination was retaliation for seeking medical leave. Doc. 20 at ¶¶32-35. The Eleventh Circuit has held that "[w]here an employee alleges FMLA retaliation without direct evidence of an employer's retaliatory intent, '[courts] apply the burden shifting framework established in' *McDonnell Douglas Corp. v. Green.*" *Tanner v. Stryker Corp. of Michigan*, 104 F.4th 1278, 1288 (11th Cir. 2024) (quoting *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018)).

"To establish a prima facie case of retaliation under [the FMLA], an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Tanner*, 104 F.4th at 1288. If she does, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the action. *Id.* at 1288-89. If the employer meets that burden, "the burden shifts back to the employee to demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* at 1289. Where the proffered reason is "one that might motivate a

9

reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Critically, "the proper causation standard for FMLA […] retaliation claims is but-for causation." *Lapham v. Walgreen Co.*, 88 F.4th 879, 893-94 (11th Cir. 2023). Thus, Fitzpatrick must show that her termination would not have occurred absent retaliatory animus.

Additionally, in the Title VII context at least, the court has held that outside the *McDonnell Douglas* framework, "an employee can prove retaliation with a convincing mosaic of circumstantial evidence." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023). "While the convincing mosaic inquiry is technically outside the bounds of *McDonnell Douglas* framework, the questions asked in that framework are still relevant." *Pasley v. Mercedes-Benz U.S. Int'l, Inc.*, No. 7:24-CV-1050-EGL, 2026 WL 972895, at *9 (N.D. Ala. Apr. 10, 2026) (citing *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023)). Where "a plaintiff fails to rebut the defendant's proffered non-discriminatory reasons for its actions, that failure tends to make the 'mosaic' significantly less convincing." *Id.*

The City concedes the first two elements of Fitzpatrick's prima facie and contests only causation. Doc. 37 at 19-20. Its primary argument is that Katrina Thomas, the relevant decisionmaker, was unaware of Fitzpatrick's protected activity. *Id.* at 20-21. Fitzpatrick counters that Thomas's awareness can be proven

circumstantially, pointing to her admission that she had access to emails between Fitzpatrick and Hjetland about Fitzpatrick's medical issues, and Thomas's knowledge that those issues were connected to Fitzpatrick's absences, tardiness, and inability to complete work assignments. Doc. 41 at 11. Fitzpatrick also identifies a close temporal proximity between these issues and her termination. *Id.* at 4-5. The City replies that several disciplinary steps predated those communications, Doc. 42 at 9, but that observation does not eliminate the possibility that the ultimate termination decision was infected by retaliatory motive.

That dispute, however, does not carry Fitzpatrick's claim across the finish line. But-for causation requires more than showing that Thomas knew of the protected activity or was potentially motivated by it; Fitzpatrick must produce evidence that the termination would not have happened had she never sought medical leave. *See Duncan v. Alabama*, 734 F. App'x 637, 641 (11th Cir. 2018). She has not. The record instead reflects a substantial and largely uncontested record of significant misconduct: four AWOL absences, insubordination, failure to complete assignments, sleeping at work, unprofessional communications, and presenting a fabricated email at her Pre-Determination Hearing. Doc. 37 at ¶45.

Fitzpatrick attempts to generate a dispute by supplying alternative interpretations of these incidents. For example, though she initially admitted to her supervisions that she *was* sleeping at work, she claims that she really wasn't; she

asserts that her unexplained absences were for medical reasons; she claims that whether her October 27 email was "actually 'disrespectful' is a fact question for a jury"; and she explains that, though she failed to complete assignments, she was still actively working on them. See Doc. 41 at 14-17. But these post-hoc explanations do not affect whether the facts then available to the City objectively justified its decision to fire her. "What matters in this inquiry is what the employer in good faith believes the employee to have done, not whether the employee actually engaged in the particular conduct." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1149 (11th Cir. 2020) (en banc). And Fitzpatrick provides no evidence to dispute that it was reasonable for her employer to (1) believe she was sleeping on the job, (2) expect her to complete her assignments, (3) expect her to give reasons for her absences, or (4) perceive her email—with its numerous rhetorical questions and invocations of slavery—as "disrespectful." Given that these justifications are plainly sufficient to independently support Fitzpatrick's termination, and the absence of evidence suggesting retaliatory intent, Fitzpatrick has failed to offer evidence sufficient to permit a reasonable jury to find the City's explanation pretextual or otherwise find that the FMLA requests led to Fitzpatrick's termination. Summary judgment is therefore warranted in the City's favor on Count 2.

## III.   Count 3: ADA Discrimination

Fitzpatrick raises two ADA discrimination theories: disparate treatment and failure to accommodate. Doc. 20 at ¶¶41-47. She contends that the City took adverse employment actions against her because of her disability, failed to engage in the interactive process after she requested a flexible or remote work schedule, and ultimately terminated her on account of her actual, regarded, or recorded disability. *Id.* at ¶¶41-49.

The ADA prohibits discriminating against a qualified individual based on disability in the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

### A. Disparate Treatment

To establish a prima facie disparate treatment claim, a plaintiff must show that (1) she was disabled; (2) she was qualified to perform the job; and (3) she suffered an adverse employment action because of her disability. *Ward v. United Parcel Serv.*, 580 F. App'x 735, 740 (11th Cir. 2014); *see also Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1192 (11th Cir. 2024) (holding that but-for causation applies to ADA disparate treatment claims). The City does not contest the first two elements. Doc. 37 at 22-25. Causation alone is disputed. *Id.* at 25.

Fitzpatrick has presented evidence that Thomas was aware of her disability, that it caused some workplace inconvenience, and that her termination was close in

time to the discovery of these facts. Doc. 41 at 11-13. But those facts alone do not sustain a reasonable inference of unlawful conduct; the same substantial and largely uncontested record of misconduct that was fatal to her retaliation claim defeats this one as well: four AWOL absences, insubordination, unprofessional communications, failure to complete assignments, sleeping at work, and presenting a fabricated document at her Pre-Determination Hearing. Doc. 37 at ¶45. The evidence, at most, suggests an alternative discriminatory basis to fire her, but she does not show that the independent and clearly sufficient non-discriminatory reasons for her termination were pretextual or that she otherwise would not have been fired but for her disability. *Lapham*, 88 F.4th at 894 ("Lapham has failed to produce sufficient evidence showing that Walgreens' proffered reasons for her termination were merely pretext for retaliation and that, but for the retaliation, Walgreens would not have fired her."). Summary judgment is therefore warranted in the City's favor on this claim.

## B. Failure to Accommodate

An employer unlawfully discriminates against a qualified individual when it fails to provide reasonable accommodations for her disability, unless doing so would impose undue hardship. *McNeal v. Macon Cnty. Bd. of Educ.*, No. 23-10410, 2024 WL 4040838, at *3 (11th Cir. Sept. 4, 2024). The plaintiff bears the initial burden of identifying a reasonable accommodation and demonstrating that it would enable

her to perform the essential functions of her job. *Id.* Only after an employee requests a reasonable accommodation must the employer initiate an interactive process to identify an appropriate one. *Id.*; 29 C.F.R. § 1630.2(o)(3).

Fitzpatrick argues that she initiated the interactive process by seeking schedule flexibility and telework options related to her medical condition. Doc. 41 at 18. That argument fails for two independent reasons. First, a bare request for workplace flexibility does not trigger the employer's interactive-process obligations; the employee must link the request to her disability rather than present it in a vacuum. *Williamson v. Clarke Cnty. Dep't of Hum. Res.*, 834 F. Supp. 2d 1310, 1320 (S.D. Ala. 2011). Second, and more fundamentally, Fitzpatrick was never denied a request to telework or adjust her schedule when she cited medical reasons for doing so. Doc. 37 at ¶19. She further acknowledged that during her medical flare-ups she is incapable of working at all, Doc. 35-1 at 45, and it is uncontested that she refused telework opportunities when they were offered, Doc. 35-3 at 14. Because Fitzpatrick has not identified any reasonable accommodation the City denied her, her failure-to-accommodate claim fails at the threshold. Summary judgment is therefore warranted in the City's favor on this claim.

## IV.    Count 4: ADA Retaliation

Fitzpatrick claims the City retaliated against her for engaging in protected activities under the ADA. Doc. 20 at ¶¶51-54.

ADA retaliation claims, like disparate treatment claims, require but-for causation. *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). The analytical framework is therefore identical to that applied in Count 3: Fitzpatrick must show that her termination would not have occurred absent retaliatory animus toward her protected activity. She cannot make that showing for Count 4 for the same reasons she could not make it for Count 3. The record reflects an extensive and largely uncontested history of misconduct that independently justified termination, even if an alternative and discriminatory basis existed for her termination, and Fitzpatrick has offered nothing sufficient to permit a reasonable jury to find that explanation pretextual and that, but for the retaliation, the City would not have fired her. Summary judgment is therefore warranted on Count 4 in the City's favor.

## CONCLUSION

Given the absence of a genuine dispute of material fact regarding the evidentiary absences the City of Birmingham has highlighted, the Court **HOLDS** that, as a matter of law, Fitzpatrick has failed to produce sufficient evidence to sustain any of her claims. Accordingly, the Court **GRANTS** the City of Birmingham's Motion for Summary Judgment (Doc. 36) as to all counts.

**DONE** and **ORDERED** this 30th day of April, 2026.

_____
**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

16